**TANYA M. KELLER**
3339 Garnet Road, Baltimore, Maryland 21704

    Plaintiff

v.

**AMERICAN EXPRESS TRAVEL
RELATED SERVICES COMPANY, INC.**
777 American Expressway
Fort Lauderdale, Florida 33329-7800

    Serve on: The Corporation Trust Inc.
    300 E. Lombard St., Baltimore, Md 21202

**CAVALRY PORTFOLIO SERVICES, LLC**
4050 E. Cotton Center Boulevard
Building 2, Suite 20,   Phoenix, AZ 85040

    Serve on: The Corporation Trust Inc.
    300 E. Lombard St., Baltimore, Md 21202

**EXPERIAN INFORMATION SOLUTIONS, INC.**
505 City Parkway West, Orange, CA 92668

    Serve On: The Corporation Trust Inc.
    300 E. Lombard St., Baltimore, Md 21202

**TRANS UNION, LLC**
1013 Centre Road, Wilmington, DE 19805

    Serve On: CSC-Lawyers Inc. Serv. Co.
    7 St. Paul St., #1660, Baltimore, MD 21202

and

**EQUIFAX INFORMATION SERVICES, LLC**
1550 Peachtree Street, NW, Atlanta, GA 30309

    Serve On: CSC-Lawyers Inc. Serv. Co.
    7 St. Paul St., #1660, Baltimore, MD 21202

    Defendants

CIRCUIT COURT FOR

BALTIMORE COUNTY, MD

Case #: 03-C-09- 1931 OT

\*   \*   \*   \*   \*   \*   \*   \*

RECEIVED AND FILED
2009 FEB 19  PM 2: 22
OF THE CIRCUIT COURT
BALTIMORE COUNTY

## COMPLAINT AND DEMAND FOR JURY TRIAL

Tanya M. Keller, Plaintiff, sues the Defendants for violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 (FCRA), the Maryland Consumer Credit Reporting Agencies subtitle, Md. Ann. Code, Commercial Law Article § 14-1212 (MCCRA), the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 (FDCPA), Maryland Consumer Debt Collection Act, Commercial Law Article § 14-202, defamation, false light invasion of privacy, and negligence.   Plaintiffs seeks actual damages, punitive damages, costs and attorney fees, as set forth in the following Complaint:

### PLAINTIFF

1.    Plaintiff Tanya M. Keller is an individual and resident of Baltimore County, Maryland and resides at 3339 Garnet Road, Baltimore, Maryland 21704.

2.    Plaintiff is a 'consumer' as defined by all laws relevant to this action.

### DEFENDANTS

3.    Defendant **American Express Travel Related Services Company, Inc.** ("American Express" or Amex) is a financial services company with offices throughout the U.S., and is a "person" and a "user" and furnisher of consumer credit and other financial information, as these terms are defined and contemplated respectively, under the FCRA and MCCRA.

4.    Defendant **Cavalry Portfolio Services, LLC** ("Cavalry") is a debt buyer and debt collector, and licensed with the State of Maryland as a collection agency with license #3514.

5.    Defendant **Experian Information Solutions, Inc.** ("Experian") is a national credit reporting agency with offices throughout the U.S., and regularly does business in Maryland.

6.    Defendant **Trans Union, LLC** ( "TU") is a national credit reporting agency with offices throughout the U.S., and regularly does business in the State of Maryland.

7.    Defendant **Equifax Information Services, LLC** ( "Equifax") is a national credit reporting agency with a principle office in Atlanta, GA, and regularly does business in Maryland.

2

## JURISDICTION

8.    This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1681p and § 1692k.

## PRELIMINARY STATEMENT

This case is about financial services and credit reporting companies that have steadfastly refused to correct inaccurate information and delete a credit card account that is not Plaintiff's account. Defendants continued to report for many years, despite Plaintiff's disputes, a credit card account that was opened by a previous employer (now out of business) of Plaintiff's. The continued reporting of this account to this day has caused Plaintiff many damages, including frustration and emotional distress, marital tension and stress, reduced credit scores, and denial of credit.

## FACTUAL ALLEGATIONS

### American Express Account

1.    In Spring of 2000 Plaintiff Keller started working at Sankyo Parke Davis (Sankyo or SPD) as a sales representative for medical and pharmaceutical products.

2.    Sankyo obtained a business or corporate American Express (Amex) card in Keller's name, as it did for other employees, and for which Plaintiff was an authorized user.

3.    The name on the Amex card was Sankyo Park Davis, with account # 379442361921007.

4.    There was a separate Amex corporate account number for Sankyo, which was account # 5690073101531, which is the account number Amex reported on Keller's credit reports.

5.    Keller never had, held, signed or saw any credit card with number 5690073101531.

6.    Keller never applied for the Sankyo corporate Amex card, requested a card from Amex, or signed any card agreement, or even saw any corporate Amex card agreement at any time.

7.    Keller used the card up to a total of about five times for large (up to $500) corporate business lunches during Spring 2000 to Fall of 2001, and for no other purposes.

8.    From October 31, 2001 to January 1, 2002 Keller was on maternity leave from Sankyo,

and did not use any Amex card during or after that time.

9.  Keller never made any payments on the card, as Sankyo took care of that for her as it did for other employees, and never agreed to pay for or be obligated on the card.

10.  About September of 2002 Keller received an email from Sankyo corporate asking about the card use and charges, and Keller told her immediate supervisor at Sankyo, Jeff Mendelson, that she had not been using the card and gave it back to Mendelson, and Mendelson told Keller that he would turn the card into Sankyo corporate, and that he would take care of everything with corporate and not to worry.  Mendelson showed Keller a few pages on monthly Amex statements, which Keller saw only briefly for this first and only time with Mendelson, which showed about $5-6,000 in total charges as of September 2002.

11.  During 2002-2003, Sankyo started falling apart, and in Sep. 2002 Keller's supervisor Jeff Mendelson started telling Keller about fraudulent activity in the company.

12.  On information and belief Keller alleges that employees or officers of Sankyo used and made charges to the corporate Amex card that Keller had been an authorized user on.

13.  In early 2003 Keller's supervisor, Jeff Mendelson, was fired from Sankyo.

14.  In the Summer of 2003 Sankyo asked Keller about the card use, and told Keller that corporate did not know anything about Mendelson explaining anything to corporate about the card use, and Keller's new supervisor Heidi required Keller to come to the company corporate office in Parsipany, NJ, and told Keller to file a police report concerning the card, and told her what to put in the report.

15.  During 2003, Amex called Keller's mother many times to collect on the account, about every other day, a couple dozen calls in all, causing stress to both Keller and her mother.

16.  On August 11, 2003 Keller filed a police report for credit card misuse at the White Marsh, Maryland precinct, and gave a copy to Sankyo corporate.

17.  Keller also gave a copy of the police report to Pete Johnson, then with the Baltimore County States Attorneys Office, and a friend of Keller's parents, to have him contact Amex to get the harassing collection calls stopped.

18.  Within about a week Pete Johnson faxed the police report to American Express, advised Keller it should be taken care of, as it was not her responsibility because it was a corporate card, and not to worry about Amex information appearing on her credit report.

19.  After Johnson faxed the letter to American Express, Amex did not call Keller any more, or send Keller any collection letters.

20.  In January 2004 Sankyo fell apart and Keller's job with Sankyo ended, including Keller's use of a company car.

21.  On March 21, 2004 Keller tried to buy a car for a new job at a Kia Foreign Motors dealer on Bel Air Road, but was not able to, because as she learned for the first time, the Amex account that was not hers, was appearing on her credit report under a credit tradeline of about $8,900, preventing her from obtaining the necessary credit for the car. Keller was only able to obtain the car by having her mother be a co-signer for the car as the primary obligor.

### Cavalry Portfolio Services, LLC - harassing conduct and violations

22.  Starting no later than March 2004 Cavalry started collecting a Sprint phone account against Keller, by reporting the account as $1553 past due on Keller's credit reports.

23.  Cavalry identified the original account number as #36484001 and the Cavalry account number as #5394835.

24.  Keller has never had or used a Sprint phone and is not responsible for the Sprint account.

25.  By 2005 Cavalry was calling Keller's mother, who lives at 8624 Rock Oak Road, Baltimore, MD, using all male callers, calling 2-3 times per day, in the early morning before 8 AM and after 9 PM, and on weekends, calling about 100 times in all, and would state that they "knew

she was Tanya's mother" and threatened to take Keller's home, bank account and assets, and threatened to call her employer and garnish her wages.

26. Keller's mother would call Keller after some of the calls from Cavalry, upsetting Keller.

27. On September 16 and December 24, 2007 Cavalry sent Keller collection letters for the Sprint account, seeking $1,553.76 but "discounted" to $932.26 and $776.88, respectively.

28. Starting around September 2007, Cavalry started calling Keller at her non-published home phone number.

29. In Sep. 2007 Keller spoke with Cavalry for the first time herself, when Cavalry called Keller's non-published number, and Keller told a female Cavalry caller that the Sprint account was not Keller's and that Keller had never had a Sprint phone.

30. Keller told Cavalry in the Sep. 2007 call not to call her again, but the woman caller threatened to keep calling.

31. Cavalry continued to call Keller's unpublished number, about 25 calls from Sep. to late Dec. of 2007, from 918-665-5600, and never left messages on Keller's home answering machine.

32. On February 20, 2008 Cavalry sent Keller another collection letter for the Sprint account, seeking $1,553.76 but "discounted" to $776.88.

33. On April 14, 2008 Cavalry sent Keller another collection letter for the Sprint account, seeking $1,553.76 but "discounted" to $621.50.

34. Just after sending the April 14, 2008 letter, a male Cavalry caller called Keller at her unpublished home number, and was very nasty, aggressive and fast talking, and tried to force Keller into a $600 settlement, but when Keller refused, the caller threatened to call Keller again, and hung up on Keller after the call had lasted about two minutes.

35. Keller never gave Cavalry her mother's number or her unpublished number.

36. Plaintiff alleges Cavalry's calls to both Keller and her mother were done with malice and

an intent to harass and cause emotional distress to Keller.

37.   Cavalry never did any, or certainly any reasonable, investigation into the Sprint account.

38.   Cavalry may have failed to report the account as disputed to the three credit bureaus.

39.   On October 7, 2008, after Cavalry had been advised by Plaintiff that the Sprint account was not hers, and without Plaintiff's permission or a valid collection reason, and knowing it had not legitimate collection reason, Cavalry accessed Plaintiff's Experian credit report.

### Credit reporting and disputes to credit reporting agencies

The Amex account appeared on Keller's credit reports and was disputed as follows:

### Experian reports

40.   Keller's March 22, 2007 Experian credit file reported the Amex account with account #5690073101531 4299, and as belonging to Keller and as a charged off account in the amount of $10,884.

41.   On March 26, 2007 Keller disputed the Amex account in a letter to Experian.

42.   Keller's September 9, 2008 Experian credit report reported the Amex account as account # 5690073101531xxx and as a charged off account with $10,884 owed.

43.   Keller's September 9, 2008 Experian credit report reported the Cavalry account as a seriously past due date collection account, as account # 539xxx and as with $1,554 owed, and did not identify or report the account as disputed by the consumer or Plaintiff.

44.   On January 7, 2009, Keller wrote a letter to Experian and disputed the American Express and Cavalry accounts, which was received by Experian.

45.   Experian failed to investigate both the Amex and Cavalry accounts.

46.   Experian continues to report the Amex and Cavalry accounts on Plaintiff's credit reports.

47.   On Jan. 7, 2009 Keller wrote Experian a letter and disputed a CACH, LLC account #1428628907030, being reported by Experian as a $465 collection account, and told

Experian this was not her account, and Experian received this letter.

48.    Experian failed to investigate the CACH, LLC account Plaintiff disputed, and continued to report the account as #14286289070306940 on Keller's Jan. 20, 2009 Experian credit report, and failed to report the account as disputed.

49.    Keller disputed the same CACH account to Trans Union, also in a Jan. 7, 2009 letter, and TU removed this account from her TU report, while Experian continued to report it.

50.    Experian's reporting of the CACH account was and is inaccurate and illegal.

### Trans Union reports

51.    Keller's March 22, 2007 Trans Union credit file reported the Amex account with account #5690073101531 4299, and as belonging to Keller and as a charged off account in the amount of $10,884.

52.    On March 26, 2007 Keller disputed the Amex account in a letter to Trans Union.

53.    Keller's September 9, 2008 Trans Union credit report reported the Amex account as account # 5690073101531xxx and as "charged off as bad debt" with $10,884 owed.

54.    Keller's September 9, 2008 Trans Union credit report reported the Cavalry account as a seriously past due date collection account, as account # 539xxx and as with $1,554 owed, and did not identify or report the account as disputed by the consumer or Plaintiff.

55.    On January 7, 2009, Keller wrote a letter to Trans Union and disputed the American Express and Cavalry accounts, which was received by Trans Union.

56.    Trans Union failed to reasonably investigate both the Amex and Cavalry accounts.

57.    Trans Union continues to report the Amex and Cavalry accounts on Plaintiff's credit reports, and has failed to mark the Amex account as disputed by the consumer.

58.    Trans Union reports the Amex account with "**Estimated date that this item will be removed: 08/2009**" whereas Experian reports the Amex account as due to "continue on

record until Mar 2009," both of which can not be accurate for the same account.

## Equifax reports

59.   On September 19, 2006 Equifax reported the Amex account as charged off.

60.   Keller's March 22, 2007 Equifax credit file reported the Amex account with account #56900073101531314299, and as belonging to Keller and as a charged off account in the amount of $10,884.

61.   On March 26, 2007 Keller disputed the Amex account in a letter to Equifax.

62.   Keller's March 26, 2007 Equifax credit file #7081041792 reported the Amex account as belonging to Keller and as a charged off account in the amount of $10,884.

63.   On March 26, 2007 Equifax's automated dispute process sent a letter to Keller stating that "Equifax verified that this item [Amex account 05690073101531] belongs to you."

64.   On March 26, 2007 Keller wrote to DINA / Dispute regarding the Amex account.

65.   Keller's May 13, 2008 Equifax report reported the Amex account as a charged off account with $10,884 owed.

66.   Keller's September 9, 2008 Equifax credit report reported the Amex account as a charged off account as account # 5690073101531xxx and as with $10,884 owed, and as "Bad debt & placed for collection & skip".

67.   Keller's September 9, 2008 Equifax credit report reported the Cavalry account as a seriously past due date collection account, as account # 539xxx and as with $1,554 owed, and did not identify or report the account as disputed by the consumer or Plaintiff.

68.   On January 7, 2009, Keller wrote a letter to Equifax and disputed the American Express and Cavalry accounts, which was received by Equifax.

69.   Equifax failed to investigate both the Amex and Cavalry accounts.

70.   Equifax continues to report the Amex and Cavalry accounts on Plaintiff's credit reports,

and has failed to mark the accounts as disputed by the consumer.

71. None of Plaintiff's disputes about credit information or accounts with any of the three credit bureaus were frivolous or irrelevant.

72. The three credit bureaus may have reported other inaccurate, adverse and damaging credit information about Plaintiff, including after Plaintiff disputed that information.

73. All three credit bureaus' conduct have resulted in lower credit scores for Plaintiff.

### Plaintiff's complaints to state agencies and others

Keller tried to obtain help for the Amex credit problem, including the following:

74. On April 10, 2007 Keller filed a dispute with the Maryland Attorney General's office, which wrote American Express's counsel in Miramar, FL on June 6, 2007.

75. On July 25, 2007 Keller wrote a letter concerning the American Express account to Congressman John Sarbanes.

### American Express Failures

76. Defendant American Express did not conduct a reasonable investigation into the false and/or incorrect information on Plaintiff's credit report and disputed by Plaintiff

77. American Express knew its credit account reporting was inaccurate and not Plaintiff's, as demonstrated by Amex's stopping collection calls after the fax of the police report from then States Attorney Pete Johnson, to avoid criminal charges, but kept reporting the account on her credit reports ("parking") because it is cheap and easy, and in fact automated, and can only create civil but not criminal liability.

78. American Express knew Sankyo was responsible for the account, *inter alia*, because Keller never signed any card agreement, a fact Amex knew from its own records, Keller did not make or sign the charges which Amex could determine from charge slips and receipts, and knew that Keller was only at most an authorized user, which Amex knows from well

established law it is familiar with as one of the largest credit card companies means that authorized users are not responsible for card accounts, but rather than accept that fact that they could not recover from an out of business company (Sankyo), Amex knowingly and wrongfully blamed Keller, and tried to force and pressure her to pay through collection activity and credit reporting.

79.     Amex knew that #5690073101531 was never an Amex account of Keller's.

80.     Amex's false reporting about Keller was done with malice and/or reckless disregard for the truth, as demonstrated by the above, and by Amex's reporting on Keller's credit reports of the corporate account #5690073101531 of Keller's former employer Sankyo, rather than the account #379442361921007 for the only Amex account for which Keller was an authorized user, and only an authorized user.

81.     Amex also knew Keller was not responsible because Sankyo had up to 200 employees who were also authorized users on the Sankyo corporate account.

82.     American Express did not adequately review the information provided by the consumer reporting agency(ies) pursuant to section 1681(a)(2) of the FCRA.

83.     American Express failed to report the results of its investigation that the information about Plaintiff was inaccurate or incomplete to all consumer reporting agencies to which American Express furnished the information.

84.     Plaintiff's disputes to the credit reporting agencies were transmitted to and received by American Express through an automated system used for transmitting consumer complaints and disputes.

85.     American Express's actions were not just willful and knowing, but recklessly indifferent and malicious towards Plaintiff, because Plaintiff's efforts revealed, at least partially, flaws of American Express, and American Express's wrongful actions continue to this date.

86.    American Express may also have disclosed false and inaccurate information about Keller to Calvary and/or Sprint regarding a Sprint phone account that was not Keller's account.

### Credit reporting agency (CRA) failures

87.    Experian, Trans Union, and Equifax (the "CRAs") are each a *consumer reporting agency* as defined in the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681a, and in Maryland Commercial Law art. (CL) § 14-1201(f).

88.    In this action the CRAs prepared, issued, assembled, transferred and otherwise reproduced *consumer reports*, regarding Plaintiff, as defined in the FCRA, 15 U.S.C. § 1681a, and under Maryland Commercial Law art. (CL) § 14-1201(d).

89.    The CRAs and their affiliate bureaus and subscribers have access to consumer credit reports, prepared by them from the same data pool, in the same database, and have duties to each consumer, including Plaintiff, about whom they report, as provided in the FCRA.

90.    Plaintiff advised the CRAs of the inaccurate information and data and requested that it be removed from its consumer reports and files of Plaintiff.

91.    The CRAs failed to employ reasonable procedures to properly reinvestigate Plaintiff's disputes and continued to prepare and issue false and inaccurate consumer reports.

92.    The CRAs took inadequate action to correct Plaintiff's consumer reports or delete the false data or otherwise conduct an appropriate, lawful reinvestigation.

93.    Despite Plaintiff's disputes, the CRAs continued to provide to creditors and potential creditors a version of Plaintiff's consumer credit report including the credit reporting error(s), resulting in credit denials and other damages to Plaintiff.

94.    Plaintiff continued to contest the false information appearing on all three of her consumer credit reports to the CRAs through January 2009.

95.    The CRAs continued to report the false, incorrect and damaging information even after

Plaintiff had complained to the CRAs several times.

96. The false consumer credit report prepared and published by the CRAs contained previously disputed, inaccurate, derogatory data or information.

97. The false reportings by the CRAs caused Plaintiff to suffer credit, embarrassment, mental anguish, marital stress, inconvenience and other pecuniary and non-pecuniary damages.

98. Despite diligent efforts by Plaintiff, her credit reports continue to contain the false and damaging information.

99. The CRAs failed to adopt and follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's consumer credit reports, as required by the Fair Credit Reporting Act, which they compiled, used and manipulated. The CRAs prepared and published false consumer credit reports, credit scores, risk factors/denial codes and other economic and data evaluations about Plaintiff.

100. The CRAs failed to adopt and follow reasonable procedures to assure the proper reinvestigation, accuracy, deletion and/or suppression of false data appearing on Plaintiff's consumer reports and as contained in their consumer reporting data bank, as required by the Fair Credit Reporting Act.

101. Equifax entered into a Consent Order with the Federal Trade Commission (FTC) on Dec. 10, 1991 which ordered Equifax to, *inter alia*, (1) maintain reasonable procedures to prevent the occurrence or recurrence of mixed files, (2) follow reasonable procedures to assure maximum possible accuracy of the information concerning consumers in consumer reports, (3) reinvestigate items of information, the completeness or accuracy of which is disputed by a consumer, and record in its system the current status of such items of information, (4) maintain reasonable procedures so that items disputed by a consumer, which are deleted or corrected as inaccurate or unverifiable upon reinvestigation, do not subsequently appear on

consumer reports, (5) make clear and conspicuous disclosure to any consumer, in connection with any reinvestigation in which an item has been deleted, of the consumer's right to request Equifax to furnish notification to users of consumer reports who have received a consumer report from Equifax for that consumer within the past six months, and (6) disclose to each consumer who requests his or her consumer report any risk score that is provided after that date to recipients of the consumer report whose identity is required to be disclosed under § 609(a)(3) of the FCRA, together with an explanation of risks cores.

102. Trans Union and Experian have also entered into similar agreements or consent decrees with state and/or federal agencies, requiring them to report credit information more accurately.

103. The CRAs's reinvestigations, if any actually were performed, failed to result in corrections.

104. The CRAs through their respective fault as described herein, caused great and irreparable injury to Plaintiff. Plaintiff has suffered damages due to the tortuous and illegal actions or inactions directed at Plaintiff by the CRAs, including but not limited to stress, frustration, lost time spent trying to fix the problem, having to pay to try to address the problem.

## PLAINTIFF'S DAMAGES

105. Plaintiff paid attorney Pete Johnson about $900 to help her with the Amex account.

106. On April 1, 2004 Keller started her current job with Octapharma.

107. Despite a healthy income at Octapharma, Keller has been and is still unable to obtain credit or financing, has received higher interest rates, and not been able to obtain a mortgage and/or refinancing, because of the American Express account being on her credit reports.

108. In 2005 Keller attempted to refinance her home with Ameriquest online but was denied because of the Amex account and the impact of the account on her credit score.

109. Keller has been denied credit in stores, causing embarrassment, and causing her mother to

make purchases for Keller, which Keller would have to reimburse her mother.

110. In December 2007 Keller attempt to get a new Nissan at the East Point Mall in Maryland, but could not get financing without her husband being the primary obligor on the financing.

111. Keller and her husband are currently paying higher interest on her Nissan car loan, because the financing obtained, through SunTrust, was at a higher rate than it would have been without the Amex account appearing on Keller's credit report.

112. The reporting of the Amex account has caused many arguments between Keller and her husband, causing marital stress to Keller over several years.

113. On January 24, 2008 Keller applied for credit at Sears in White Marsh Mall, but was denied in the store, causing Keller embarrassment and humiliation, and having to write a check.

114. During 2008 Keller did not apply for financing when purchasing a ring at Nelson Coleman, for fear of being denied credit.

115. In July of 2008 Keller attempted to refinance her home with Carrolton Bank, with a Rebecca Coleman and was denied credit because all three credit reporting agencies were reporting the Amex account.

116. In September 2008 Keller again did not apply for credit at Sofa's Etc. when purchasing furniture for her son, for fear of being denied and humiliated, and instead, had to pay with her mother's credit card.

117. In the Fall of 2008 Keller applied for a US Airways credit card, but was denied credit.

118. In December 2008 Keller applied for and was denied credit at a Target store, and had to pay for her purchases with a check.

119. In Dec. 2008 Keller and her husband went to the Big Screen TV store, and Keller was sweating bullets when she and her husband were asked to fill out the credit application, for fear they would be denied because of her credit report, and as a result, had only her

husband's name put on the application.

120. In January 2009 Plaintiff again applied for a US Airways credit card, but was denied credit again.

121. Plaintiff suffered severe emotional stress and mental anguish, worry and lost sleep due to the false information appearing on her credits report for several years despite tremendous effort to fix the problem.

122. The many years of frustration, credit denials, adverse impact on her mother, lack of response by both American Express and the credit reporting agencies, time spent writing letters and contacting federal and state agencies or elected persons, dealing with her former employer, marital stress, has caused Keller depression.

123. The continuing reporting of the Amex to this day requires Keller to take an over the counter medicine to help her sleep at night.

124. The Amex account also causes Keller emotional distress because she is actively planning to move, having recently sold her house, and must move soon, and will need to obtain credit or financing for a new mortgage for that, but knows from experience she can not.

125. Plaintiff spent probably hundreds of hours of time spent on the telephone, writing letters and e-mails, and monitoring and reviewing files and accounts to attempt to correct a problem that was Defendants', not Plaintiff's, fault.

126. Plaintiff has only a $500 credit limit on her Capital One and Macys credit cards, because of the Amex account, and her credit increase requests for Capital One have been denied.

127. Plaintiff spent time with her mother on the phone, including on weekends, due to credit problems caused by Amex and Cavalry.

128. Plaintiff spent money in postage and return receipt mail letters to try to fix the problems.

129. Plaintiff suffered defamation and denial of credit from potential creditors of Keller.

## ADDITIONAL ALLEGATIONS

130. The above and foregoing actions, inactions and fault of Defendants, as to each and every Count described below, have proximately caused a wide variety of damages to Plaintiff.

131. Defendants' false credit reporting about Plaintiff was defamatory and have been a substantial factor in causing credit denials, emotional distress, out of pocket costs, and other damages.

132. Defendants have negligently and/or willfully violated various provisions of the Fair Credit Reporting Act and Maryland Commercial Law article and are liable to Plaintiff.

133. Defendants are liable to Plaintiff for all actual, statutory, exemplary and punitive damages awarded in this case, as well as other demands and claims asserted herein including, but not limited to, out-of-pocket expenses, credit denials, costs and time of repairing their credit, pain and suffering, embarrassment, inconvenience, lost economic opportunity, loss of incidental time, frustration, emotional distress, mental anguish, fear of personal and financial safety and security, attorneys' fees, and court costs, and other assessments proper by law and any and all other applicable federal and state laws, together with pe-judgment and legal interest from date of judicial demand until paid.

## COUNTS 1 through 23

All of the previous paragraphs are incorporated herein for all of the following Counts:

### COUNT 1 - Common Law Negligence

Plaintiff incorporates all previously alleged paragraphs herein for the following Counts:

134. Defendants each owed duties of reasonable care to Plaintiff.

135. The Defendant CRAs each failed to exercise reasonable care and prudence in the matching of consumer credit data, preparation and publication of consumer credit reports, in preparing

and publication of each subsequent reporting and re-reporting, the handling and reinvestigation of data about Plaintiff, all made the subject of this suit, and which consequently caused damages to Plaintiff.

136. Defendant Cavalry failed to exercise reasonable care and prudence in its collection practices, in checking the origination and source of information on collection accounts, in its collection calling practices, and in its training of employees and collection agents.

137. Defendants each breached their duty and caused damages to Plaintiff.

### COUNT 2 - Defamation

138. All Defendants recklessly, maliciously and/or intentionally, published and disseminated false and inaccurate information concerning Plaintiff with reckless disregard for the truth of the matters asserted.

139. All Defendants' publishing of such false and inaccurate information has severely damaged the personal and consumer reputation of Plaintiff and caused severe humiliation, emotional distress and mental anguish and business and personal losses to Plaintiff.

140. Defendants were notified of inaccuracies by Plaintiff, but Defendants continued to issue and/or publish report(s) to third parties which contained inaccurate information about Plaintiff.

141. Defendants have, with willful intent to injure and/or maliciously, defamed Plaintiff.

### COUNT 3 - False Light Invasion of Privacy

142. Defendants' conduct, as described herein, constituted an invasion of Plaintiff's privacy which was offensive to any person of ordinary sensibilities. Said invasion was an unreasonable intrusion into the private life and matters of Plaintiff and constituted a public disclosure of private matters in a manner which placed Plaintiff in a false light, and has damaged Plaintiff.

18

143. Defendants' conduct, as described herein, constitutes an unlawful and actionable invasion of Plaintiff's privacy, and has damaged Plaintiff, entitling Plaintiff to an award of damages, both compensatory and punitive, against Defendants.

### COUNT 4 - Fair Credit Reporting Act, 15 U.S.C. § 1681e(b)

(all three CRAs' liability for failure to assure maximum possible accuracy)

144. All Defendant CRAs failed to adopt and follow "reasonable procedures" to assure the maximum possible accuracy of Plaintiff's consumer credit and other personal information, as required by the Fair Credit Reporting Act, which they compiled, used and manipulated, in order to prepare consumer credit reports, credit scores, risk factors/denial codes and other economic and data evaluations.

145. All Defendant CRAs have continually added, stored, maintained and disseminated personal and credit information, in consumer reports it prepared and issued, about the Plaintiff which was inaccurate, false, erroneous and misleading despite notice from the Plaintiff and governmental agencies that such information was inaccurate.

146. All Defendant CRAs have willfully, or alternatively, negligently, violated the Fair Credit Reporting Act, 15 U.S.C. § 1681e(b), on multiple occasions.

147. All three Defendant CRAs cause Plaintiff damages.

### COUNT 5 - Fair Credit Reporting Act, 15 U.S.C. § 1681i(a)

(all three CRAs' liability for reinvestigation of disputed information)

148. Plaintiff advised all three Defendants CRAs, on multiple occasions, of the inaccurate and false data and demanded that the data be removed from Plaintiff's consumer reports and credit data files.

149. All three Defendant CRAs failed to properly reinvestigate Plaintiff's disputes and

Defendant continued to prepare and publish false consumer reports.

150.   All three Defendant CRAs were aware of Plaintiff's disputes, as well as their inadequate reinvestigation but chose to leave disputed, false data as attributable to Plaintiff.

151.   All three Defendant CRAs failed to use reasonable procedures to reinvestigate Plaintiff's disputes and, likewise, took inadequate action to correct Plaintiff's consumer reports or delete the false data or otherwise conduct an appropriate, lawful reinvestigation.

152.   All three Defendant CRAs failed to take necessary and reasonable steps to prevent further inaccuracies from entering Plaintiff's credit file data and such false data continued to be posted as new consumer credit reports were prepared, issued and disseminated by the Defendant CRAs and relayed for further use, reliance and publication by their subscribers.

153.   All three Defendant CRAs failed to adopt and follow reasonable procedures to assure the proper reinvestigation, accuracy, deletion and/or suppression of false data appearing on Plaintiff's consumer reports and as contained in their consumer reporting data bank, as required by the Fair Credit Reporting Act.

154.   All three Defendant CRAs willfully, or alternatively, negligently, violated the Fair Credit Reporting Act, 15 U.S.C. § 1681i(a), on multiple occasions.

155.   All three Defendant CRAs failures cause Plaintiff damages.

### COUNTS 6-8 - Maryland Commercial Law Article - all three CRAs

Plaintiff incorporates all previous paragraphs in this suit, and further alleges that:

156.   **COUNT 6.** The three Defendant CRAs, **Experian, Trans Union and Equifax,** violated the Maryland Commercial Law article, § 14-1205(b) and §14-1208, (MCCRA) by, *inter alia,* failing to assure maximum possible accuracy in credit report information, and to delete inaccurate information, and did so willfully and/or negligently.

157.   **COUNT 7. Equifax, Experian and Trans Union** violated CL § 14-1208(a)(1) by failing to perform the required reinvestigation when Plaintiff disputed the Account.

158.   **COUNT 8. Equifax, Experian and Trans Union** violated CL § 14-1208(a)(2) by failing to delete within 7 business days the information from Plaintiff's credit report or file.

159.   Plaintiff suffered actual and statutory damages due to Defendants' MCCRA violations.

   **COUNT 9 - American Express's failure to fulfill duties of a credit information furnisher**

160.   Plaintiff incorporates all previous paragraphs in this suit, and further alleges that American Express violated the FCRA, 15 U.S.C. § 1681s-2(b)(1)(A) through (D), by *inter alia*, failing to conduct a reasonable investigation, failing to review all relevant information provided by Plaintiff, failing to report of such reasonable investigation based on all relevant information to the credit reporting agencies, and failing to report that the information reported on Plaintiff's credit report was incomplete or inaccurate or both, and failed to do so timely within the FCRA's deadline for such investigations.

161.   American Express's failures were repeated, knowing, willful and malicious.

162.   Plaintiff suffered actual and statutory damages due to American Express's failures.

   **COUNTS 10 - 18 - FDCPA violations by Cavalry**

163.   **COUNT 10.** § 1692c(a)(1) - communication in connection with debt collection at any unusual time or place or a time or place known or which should be known to be inconvenient to the consumer, including after 9:00 PM.

164.   **COUNT 11.** § 1692d(5) - harassment and abuse in connection with debt collection, including but not limited to causing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number.

165.   **COUNT 12.** § 1692d(6) - harassment and abuse in connection with debt collection, including but not limited to placement of telephone calls without meaningful disclosure of the caller's identity.

166.   **COUNT 13.** § 1692e(2)(A) - false representation of the character or amount of a debt.

167.   **COUNT 14.** § 1692e(4) - representation or implication that nonpayment of any debt will result in . . . the seizure, garnishment, attachment, or sale of any property or wages of any person unless such action is lawful and actually intended by the collector or creditor.

168.   **COUNT 15.** § 1692e(5) - threats to take action that cannot legally be taken or not intended to be taken.

169.   **COUNT 16.** § 1692e(8) - communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed.

170.   **COUNT 17.** § 1692e(10) - false representation or deceptive means to collect or attempt to collect a debt or information concerning a consumer.

171.   **COUNT 18.** § 1692f(1) - collecting an amount not (including any interest, fee, charge, or expense) expressly authorized by the agreement creating the debt or permitted by law.

### COUNTS 19-21 - Maryland Consumer Debt Collection Act (MCDCA) violations Maryland Ann. Code, Commercial Law article (CL) § 14-202

172.   Defendant Cavalry's actions violated the following MCDCA provisions:

**COUNT 19.** CL § 14-202(3) - disclose or threaten to disclose information which affects the debtor's reputation for credit worthiness with knowledge that the information is false.

**COUNT 20.** CL § 14-202(6) - communicating with the debtor in any manner as reasonably can be expected to abuse or harass the debtor.

**COUNT 21.** CL § 14-202(8) - claiming, attempting, or threatening to enforce a right

with knowledge that the right does not exist.

### COUNT 22 - Cavalry's Impermissible access - FCRA, 15 U.S.C. § 1681b

173.   Cavalry accessed Plaintiff's consumer report aka credit report without permission or another allowable reason under the FCRA.

174.   Cavalry's access willfully, or alternatively, negligently, violated the Fair Credit Reporting Act, 15 U.S.C. § 1681b.

175.   Cavalry's access was an illegal invasion of privacy and caused Plaintiff damages.

### COUNT 23 - Cavalry's Impermissible access - Maryland Commercial Law

176.   Cavalry violated Md. Ann. Code, Commercial Law (CL) Art. § 14-1202(a) by willfully and/or negligently obtaining Plaintiff's credit report or getting others to access it for Defendant and/or for Defendant's benefit, without a permissible reason and without Plaintiff's consent, damaging Plaintiff.

177.   Cavalry's impermissible access was an invasion of privacy and caused Plaintiff damages.

### RELIEF AND DAMAGES SOUGHT
### FCRA
### Negligent FCRA Violations

178.   Pursuant to 15 U.S.C. § 1681o, any person who is negligent in failing to comply with any requirement imposed under the FCRA with respect to any consumer is liable to that consumer in an amount equal to the sum of (i) any actual damages sustained by the consumer as a result of the failure and (ii) in the case of any successful action to enforce any liability under 15 U.S.C. § 1681o, the costs of the action together with reasonable attorneys' fees.

179.   Defendants are liable to Plaintiff in an amount equal to the sum of (i) any actual damages sustained by the plaintiff as a result of said failure and (ii) the costs of this action together with reasonable attorneys' fees, and subject to (iii) injunctive relief.

### Willful FCRA Violations

180.  Pursuant to 15 U.S.C. § 1681n, any person who willfully fails to comply with any requirement imposed under the FCRA with respect to any consumer is liable to that consumer in an amount equal to the sum of (i) any actual damages sustained by the consumer as a result of the failure or damages or not less than $100.00 and not more than $1,000.00; (ii) $1,000 for obtaining a consumer report under false pretenses or knowingly without a permissible purpose; (iii) such amount of punitive damages as the court may allow; and (iv) in the case of any successful action to enforce any liability under 15 U.S.C. § 1681n, the costs of the action together with reasonable attorney's fees.

181.  Defendants willfully failed to comply with the FCRA, § 1681 et seq.

182.  As a result of Defendants' willful failure to comply with the FCRA, Defendants are liable to the Plaintiff in an amount equal to the sum of (i) any actual damages sustained by the plaintiff as a result of the failure or damages of not less than $100.00 and not more than $1,000.00 for each such violation; (ii) $1,000 for obtaining a consumer report under false pretenses or knowingly without a permissible purpose; (iii) such amount of punitive damages as the court may allow; and (iv) the costs of this action and with reasonable attorneys' fees.

183.  Plaintiff seeks declaratory judgment relief under Courts and Judicial Proceedings (CJP) § 3-409 and 28 U.S.C. § 2201 that each of the three Defendant CRA's practices and procedures for reinvestigating disputes by consumers violates the FCRA, and injunctive relief pursuant to both the Court's inherent powers and pursuant to CJP § 3-412.

### Maryland FCRA

184.  Per Maryland CL Art. § 14-1213(a) (willful violations) and/or (b) (negligent violations), Plaintiff seeks actual damages, punitive damages, costs and reasonable attorneys fees.

### FDCPA

185.  Plaintiff seeks from Cavalry:

   (1)  actual damages for each separate violation of the FDCPA pursuant to 15 U.S.C. § 1692k(a)(1);

   (2)  statutory damages of $1,000 for each separate violation of the FDCPA pursuant to 15 U.S.C. § 1692k(a)(2)(A);

   (3)  costs and reasonable attorney's fees pursuant to 15 U.S.C. § 1692k(a)(3);

### Maryland Consumer Debt Collection Act (MCDCA)

186.  Per Maryland CL Art. § 14-203 and § 13-408, Plaintiff seeks actual damages, costs, and

reasonable attorneys fees.

**WHEREFORE** Plaintiff requests from all Defendants actual damages, common law damages, statutory, actual and punitive damages under the FCRA, actual and punitive damages under the Maryland Commercial Law Article, in an amount of not less than $1,000,0000, plus reasonable attorneys fees and costs pursuant to 15 U.S.C. § 1681n and § 1681o and the Maryland Commercial Law Article § 14-1213(a) and (b), and declaratory and injunctive relief against the three CRAs; from Cavalry actual and statutory damages of not less than $75,000 for violations of the FCRA, FDCPA and MCDCA plus reasonable attorneys fees; plus costs, pre-judgment interest, and other such relief as justice requires.

## REQUEST FOR A JURY TRIAL

Plaintiff requests a jury trial on all issues triable to a jury.

Respectfully submitted,

/s/ *Michael C. Worsham*
_____

Michael C. Worsham, Esq.
1916 Cosner Road
Forest Hill, Maryland 21050-2210
(410) 557-6192
Fax: (410) 510-1870
mcw at worshamlaw.com
Federal Bar #25923
*Attorney for Plaintiff*

February 17, 2009